# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **MARION DIABATE,** *on behalf of herself and all others similarly situated*, <br> **Plaintiff,** <br><br> **v.** <br><br> **MV TRANSPORTATION, INC.,** <br> **Defendant.** | **CIVIL ACTION** <br><br> **NO. 14-857** |

## <u>OPINION</u>

This is a wage and overtime case. Marion Diabate seeks to be the lead plaintiff in a collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and a class action under the Pennsylvania Minimum Wage Act ("MWA"), 43 Pa. Cons. Stat. § 333.101 *et seq.*, and Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons. Stat. § 260.1 *et seq*. She alleges that her former employer, MV Transportation, Inc. ("MV"),[1] a company providing paratransit services, has failed to pay required wages and overtime for certain pre- and post-shift activities and for work performed during periods of time designated as uncompensated meal breaks. Before the Court is Diabate's Motion for Conditional Certification of a Collective Class Under the FLSA and Certification of a Class under Rule 23 of the Federal Rules of Civil Procedure. For the reasons that follow, Diabate's motion for conditional certification of a FLSA collective action will be granted in part and her motion for class certification of the state law claims will be denied.

---

[1] Diabate was employed by MV as a paratransit driver from approximately September 2012 through December 31, 2013. Compl. ¶ 31.

# I. BACKGROUND

## A. *Factual History*

MV has contracted with the Southeastern Pennsylvania Transportation Authority ("SEPTA") to provide paratransit services to passengers with disabilities that render them unable to use SEPTA's bus, trolley, subway, and train services. SEPTA schedules rides for these passengers through a program called RouteMatch, and provides MV with a manifest for each tour, after which MV assigns a driver. *Id.* (citing Deposition of Brian Hastings ("Hastings Dep.") at 149).[2] According to a collective bargaining agreement between MV and the Transport Workers Union of Philadelphia, Local 234, drivers bid on tours, based on seniority, at least once per year. *See* Mot. Ex. 17, Agreement between MV Transportation, Inc. (Employer) and Transport Workers Union of Philadelphia, Local 234 (Union) ("CBA") at 13-14. MV runs approximately 175 tours per day on weekdays, 75 tours on Saturdays, and fewer than 70 on Sundays; most tours are scheduled so that drivers and aides work at least 40 hours per week. Deposition of Celeste Brown ("Brown Dep.") at 57:15-58:2; Mot. Ex. 21. The CBA also provides that any covered employee who has worked for MV for more than two years is entitled to a guaranteed forty-hour workweek if she works as assigned. CBA at 13. MV does not automatically pay the guarantee to employees who are entitled to it if they are assigned fewer than forty hours of work in a week, and "instead relies on the employee to affirmatively request to be paid the guaranteed time." Mot. at 12 (citing Deposition of Patricia L. Danas ("Danas Dep.") at 166-69). In those instances where the employee is assigned fewer than forty hours, if she does not request to be paid the difference, she is not paid for the time to which she is entitled under the CBA. Danas Dep. at 167:12-169:5.

[2] During the relevant time period—three years prior to the filing of the Complaint on February 10, 2014—MV employed approximately 80 to 300 drivers, as well as 20 aides, whose job it is to assist drivers on tours with passengers who require additional assistance. Hastings Dep. at 223:19-24; Youngston Dep. at 35:18-36:14.

### 1. Pre-Shift and Start of Shift

On a daily basis, SEPTA schedules the passenger rides for each tour and sends a report to MV the night prior containing the time each tour is expected to leave MV's yard in the morning (the "Leave Yard time"). Mot. at 7. In addition to the manifest generated via the RouteMatch software, each driver is issued a Tour Cover Sheet and a Supplemental Trip Sheet. Mot. at 3; *see also* Mot. Ex. 3. MV normally preprints the "Clock-In time" (the employee's start time) and the "Leave Yard time" on the Tour Cover Sheet, providing a twelve-minute period that it pays employees prior to the employee leaving the yard. Hastings Dep. at 189:19-190:190:2. During this twelve-minute period, drivers must perform a variety of pre-trip tasks:

(1) Pick up the manifest and keys to the van from the office;

(2) Map out the tour;

(3) Locate and start the van;

(4) Enter identification and tour number on the van's electronic terminal;

(5) Complete a pre-trip inspection of the van in order to identify any visual defects, problems, or safety issues, and fill out a Daily Vehicle Inspection Report; and

(6) Wait in line to get out of the gate.

*See* Hastings Dep. at 77:24-82:16; Mot. Ex. 25, Daily Vehicle Inspection Report. The pre-trip inspection, as detailed in MV's "Study Guide" provided to drivers, is comprised of four single-spaced pages of tasks that each driver is required to complete. Mot. Ex. 24, MV Transportation, Inc. Study Guide at 77-81. Diabate contends that to get it all done drivers would typically arrive, receive their manifests, and begin work prior to their assigned Clock-In Time to ensure that they had adequate time to complete the tasks and get out of the gate by the SEPTA-provided Leave Yard time. Deposition of Marion Diabate ("Diabate Dep.") at 23:16-28:22; Deposition of Shawn Boykin-Barnes ("Boykin-Barnes Dep.") at 62:9-76:5; Deposition of William R. Windal, Sr. ("Windal Dep.") at 22:17-24:12; Deposition of John Youngston, Sr. ("Youngston Dep.") at

140:9-145:9.  There is, however, almost no company record of the days or times drivers picked up their documents early—if they did do so at all—save for approximately one month in and around October 2011, where MV timestamped each Tour Cover Sheet when the driver picked it up.  *See* Hastings Dep. at 49:21-50:20.

The parties do not dispute that MV did not require its drivers to pick up the manifest and Tour Cover Sheet or engage in any other work activity before their scheduled "Clock-In" start time.  *See* Diabate Dep. at 26-27, 78; Mot. Ex. 19, Deposition of Alexis Duffy ("Duffy Dep.") at 112:9-17, 114:5-8; Windal Dep. at 27:19-22.[3]  Some drivers picked up their documents upon arrival at MV's facility before their Clock-In Time, while others picked up their documents upon their on-time arrival for the start of their shift with no adverse consequences.  Windal Dep. at 28:5-11.  Drivers had a host of reasons for early arrivals: some took public transportation to work, some merely desired to not be late, and some arrived early out of personal habit.  *See* Diabate Dep. at 26:24-27:5; Boykin-Barnes Dep. at 53:17-57:1; Deposition of Tameka P. Leak ("Leak Dep.") at 32:22-36:8; Windal Dep. at 29:13-20.  Drivers who picked up their manifest and tour cover sheet prior to their shift could, and often would, engage in various non-work activities, including relaxing in the employee lounge, drinking coffee, watching television, reading the newspaper, smoking, socializing, returning to their personal vehicle, or otherwise waiting for their shift to begin.  *See* Duffy Dep. at 110:20-112:17; Leak Dep. at 53:10-19.

SEPTA, not MV, schedules the Leave Yard time based on the time it determines the driver needs to timely arrive at her first passenger pick-up location, taking into account distance and traffic patterns.  Hastings Dep. at 47:15-48:14.  SEPTA does not permit a driver to arrive at the first passenger's pick-up location too far in advance of their scheduled pick-up time.  *See*

---

[3]   In fact, on August 21, 2014, Brian Hastings, the General Manager of MV's Philadelphia operation, circulated a memo reporting MV's national policy that drivers would no longer be permitted to receive their manifests prior to their scheduled start time, thus preventing drivers from doing work before checking in.  *See* Mot. Ex. 8.

Leak Dep. at 68:7-21; Duffy Dep. at 33:17-34:19.  Accordingly, there would be, MV states, no reason for it to have a driver working in advance of the Clock-In Time.  Transcript of Oral Argument, July 13, 2015 ("Arg. Tr."), at 31.

Some opt-in plaintiffs have testified that it could take up to fifteen minutes (rather than the allotted twelve) to complete all pre-tour activities.  Molock Dep. at 20:8-14; Windal Dep. at 38:18-39:2.  Even if this were so, however, as long as a driver picked up her manifest at the scheduled start time, she was considered "on time," and MV did not penalize or discipline her if she were unable to leave the parking lot by the Leave Yard time.  *See* Boykin-Barnes Dep. at 77:3-11; Molock Dep. at 21:19-22:20; Windal Dep. at 39:11-21; Youngston Dep. at 145:16-147:5.  By way of example, one opt-in plaintiff, Tameka Leak, testified  that, as a rule, she left the yard at the Leave Yard time only about once per week.  Leak Dep. at 64:14-65:11.  A SEPTA representative is on site to monitor the times the vans leave MV's yard, and SEPTA and MV are in constant communication regarding the timeliness of pick-ups and drop-offs.  Arg. Tr. at 32.  As defense counsel noted at oral argument, delays in leaving the yard due to a myriad of circumstances "could create some stress for MV, but not for the driver."  *Id.*

### 2.    Breaks and Meals

At times during the day, a driver's van is empty:  her assigned tour may contain more time than needed to go from the drop-off of one passenger to the pick-up of the next, or rides may be cancelled during the course of a tour.  *See* Duffy Dep. at 59.  If any of the breaks resulting from these or other circumstances are shorter than two hours in duration, the collective bargaining agreement requires that the driver be paid for that time.  *See* CBA, art. IX, § 5, at 13.  Breaks longer than two hours, however (called "O" breaks), are unpaid.  Hastings Dep. at 168:18-22.

MV also had a policy of deducting half an hour for a lunch break where it determined that she would have had at least thirty minutes to take that break.  Danas Dep. at 32:13-40:5.

5

These meal deductions were taken after a billing clerk at MV reviewed a driver's manifest and—taking into account pick-up and drop-off times for passengers, as well as mileages and traffic patterns between stops—concluded that she had sufficient time to take a thirty-minute meal break. *See id.* at 32:20-33:14; Hastings Dep. at 131:4-24. MV also had a meal break deduction cancellation policy, through which a driver could have the deduction overridden if she wrote "no break" on her manifest and included a written explanation as to why a meal break could not be or was not taken (because they were unable to take a meal break due to, for example, traffic, construction, or other unforeseen circumstances), despite the fact that the manifest telegraphed sufficient time for one. Even if a meal break deduction was taken, if a driver believed that the deduction should not have been taken, she could raise the issue with MV by filling out a Payroll Discrepancy Form. *See, e.g.*, Hastings Dep. at 132:1-133:4; Duffy Dep. at 15:2-16:5. If MV accepted the justification on the form, its policy was to override the meal break and treat the thirty minutes as on-the-clock work time. Hastings Dep. at 130:11-131:24, 133; Danas Dep. at 37:4-18; Opp'n Exs. K, O. Accordingly, in many instances, drivers were successful in reversing meal break deductions. *See* Boykin-Barnes Dep. at 184:7-185:15; Youngston Dep. at 121:10-122:18; Diabate Dep. at 76:13-77:4; Opp'n Ex. R.

### 3. End of Shift and Post-Shift

#### a. *Return Yard Time and Check-Out*

At the end of a tour, a driver returns to the yard, parks the vehicle, logs her ending mileage and Return Yard time on the Tour Cover Sheet, and performs a post-trip vehicle inspection. Hastings Dep. at 91:17-92:5. The post-trip vehicle inspection involves precisely the same tasks as the pre-trip vehicle inspection. *See* Deposition of Lorenzo J. Harmon ("Harmon Dep.") at 58:1-12. The driver then goes to the office to turn in paper manifests and any cash

fares collected during the day. Hastings Dep. at 92:6-93:4. Until August 2014,[4] generally only one clerk was available to check drivers out at the end of the day, which often resulted in drivers having to wait in line to check out. Harmon Dep. at 23:1-24:14. Performing all the required tasks and waiting to check out could take a driver ten to twenty-five minutes or more after returning to the yard. *See, e.g.*, Diabate Dep. at 34:13-22; Boykin-Barnes Dep. at 29:3-16. Regardless of the amount of time taken, MV's policy was to pay drivers for only five minutes after their Return Yard time; supervisors were instructed to add five minutes to the Return Yard time and enter that as the clock-out time on the Tour Cover Sheet. Harmon Dep. at 17:3-16. Some drivers at times complained about not receiving pay for all of the time worked at the end of their tour, but those drivers were told they were to be paid for only five minutes. *Id.* at 19:19-20:5.

In contrast to the Leave Yard time, which is preprinted by MV on the Tour Cover Sheet, the Return Yard time is filled in by the drivers themselves. In fact, Diabate and several opt-in plaintiffs testified that, because the drivers control writing the Return Yard time on the Tour Cover Sheet, they knew to record their Return Yard time only when they were ready to check out, "thereby ensuring that the five-minute window would be more than sufficient to compensate them through the end of the checkout process." Opp'n at 19; *see also* Molock Dep. at 28:9-29:7; Diabate Dep. at 35:22-36:4; Windal Dep. at 165:17:-169:12; Opp'n Exs. S-U.

### b.   *Drive Cam Sessions*

To monitor drivers, MV uses "Drive Cam," a system consisting of a camera installed in each vehicle that records activity in and out of the vehicle. Mot. at 5 (citing Mot. Ex. 13, Deposition of Mary Saunders ("Saunders Dep.") at 28). Whenever the Drive Cam camera records an incident, information regarding that incident is sent to a third-party vendor for

---

[4]   On August 21, 2014, MV's policy was amended to mandate that drivers would be paid until they actually checked out with the clerk at the end of each shift. Mot. Ex. 8. "Times should never be assumed or calculated from the return-to-yard time." *Id.*

processing, and then forwarded to MV.  Saunders Dep. at 30:3-33:16.  Some drivers are required

to meet with the "Drive Cam Manager" at the end of particular tours to discuss incidents that

occurred over the course of one or more of their tours.  *See, e.g.*, *id.* at 35:17-36:5.  If a driver is

required to attend one of these meetings with the Drive Cam Manager, she may work for an

additional ten to twenty minutes, depending on the wait time to meet with the manager.  *Id.* at

63:12-65:18.  The Drive Cam Event Reports submitted with Diabate's motion show the time a

driver completes a session with the Drive Cam Manager; however, this time can sometimes be

after the time recorded as the driver's clock-out time.  *See id.*  By way of example, Diabate

produced two Drive Cam reports for driver Terrance Molock.  *See* Mot. Ex. 28.  Two events

were recorded: one on May 16, 2012, and one on May 18, 2012.  *Id.*  Mary Saunders, the Drive

Cam Manager, met with Molock on the evening of May 21, 2012; the Drive Cam report and

Saunders's accompanying comments, were printed that day at 6:08 PM and 6:16 PM.  *Id.*

However, according to payroll records from that day, Molock's clock-out time was listed as 5:45

PM, despite the fact that he worked for more than half an hour past that time. *Id.*; *see also*

Saunders Dep. at 68:2-69:18.

That said, MV's stated policy and practice is to treat Drive Cam sessions as compensable

hours worked.  Hastings Dep. at 185:15-20; *see also* Boykin-Barnes Dep. at 163:21-165:15;

Leak Dep. at 138:4-140:22; Molock Dep. at 71:3-72:16; Opp'n Exs. X-GG.  If mistakes are

made and a driver's Drive Cam session was erroneously not reported as time worked, the driver

could submit a Payroll Discrepancy Form to have the error corrected.  *See, e.g.*, Boykin Barnes

Dep. at 182:2-185:13.

## B.    *Procedural History*

Diabate's complaint seeks a collective action under the FLSA and a class action under the

MWA and WPCL to recover unpaid and overtime wages due for pre- and post-shift activities

described *supra* and for the incorrect occasional designation of certain periods of time as uncompensated meal breaks. She has sent out notices of collective action and, since the initial filing of the Complaint, an additional ninety plaintiffs have joined the FLSA action pursuant to 29 U.S.C. § 216(b). Mot. at 1.

She now seeks conditional certification of a FLSA collective action, and certification of a class—pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3)—defined as:

> **All current and former driver and aide employees of Defendant MV Transportation, Inc. at the company's Philadelphia, Pennsylvania facility who worked at any time during the period of February 10, 2011, to the present.**

ECF No. 121 at 3.

From the outset, discovery in this case has been bifurcated, with the first stage of discovery limited to "conditional certification of Plaintiffs' claim under the Fair Labor Standards Act; and Rule 23 class certification of the claims of Plaintiff and the class under Pennsylvania law." Scheduling Order at 1-2, ECF No. 22 (June 18, 2014). The second stage of discovery ("addressing the merits of the class and collective claims and alleged damages"), by order of the Court, was to begin "[w]ithin fourteen (14) days of this Court's order on Plaintiff's Motion for Class and Conditional Certification." *Id.* at 2.

## II.    COLLECTIVE ACTION PURSUANT TO THE FLSA

"The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 (2013). Under the collective action provision of the FLSA, 29 U.S.C. § 216(b), an employee may bring an action on her own behalf and on behalf of other "similarly situated" employees. To be included in a collective action, plaintiffs must be "similarly situated" and give written consent. *Id.*

This Court applies a two-step process for deciding whether an action may proceed as a collective action under the FLSA. *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013); *Zavala v. Wal-Mart Stores, Inc.*, 691 F.3d 527, 535 (3d Cir. 2012). At the first step, it must make "a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 192 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 1523. Under this standard, "a plaintiff must produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Id.* at 193. The level of proof required at this stage is fairly lenient: a "'modest factual showing' that the proposed recipients of opt-in notices are similarly situated" is all that is required. *Id.* at 192-93; *see also Mott v. Driveline Retail Merchandising, Inc.*, 23 F. Supp. 3d 483, 486 (E.D. Pa. 2014) ("'[M]odest factual showing' is an 'extremely lenient standard.'" (quoting *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003))).

In a FLSA collective action, "'similarity' between class members' claims means that the class members share common 'terms and conditions' of employment, which may be shown through the existence of a 'common policy, plan, or practice.'" *Gordon v. Maxim Healthcare Servs., Inc.*, No. 13-7175, 2014 WL 7008469, at *2 (E.D. Pa. Dec. 11, 2014) (quoting *Bramble v. Wal-Mart Stores, Inc.*, No. 09-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011)); *see also Mott*, 23 F. Supp. 3d at 486 ("The court conducts a preliminary inquiry into whether the plaintiff's proposed class members were collectively 'the victims of a single decision, policy, or plan.'" (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 (3d Cir. 2007))). The Court *does not*, however, consider the merits of the dispute; the plaintiff must demonstrate only that the potential class members' positions are similar, not identical, to her own. *Ornelas v. Hooper Holmes, Inc.*, No.

10

12-3106, 2014 WL 7051868, at *2 (D.N.J. Dec. 12, 2014); *see also Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453, at *11 (E.D. Pa. June 30, 2014) (finding that a plaintiff's evidence suffices "where declarations and deposition testimony detail common job duties and responsibilities across the named plaintiff and the proposed class"). If the plaintiff satisfies her burden, the court will "conditionally certify" the collective action "for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery." *Camesi*, 729 F.3d at 243. At the second stage, after further discovery, a court makes "a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Symczyk*, 656 F.3d at 193.

Given the course the proceedings in this case have taken, the parties are at odds over which stage of certification they find themselves in and, as a result, which standard of analysis this Court should apply. The Court recognizes the case's unorthodox posture: ninety consent notices have been filed by Diabate's counsel on behalf of opt-in plaintiffs and a substantial amount of discovery has taken place, despite the fact that the class has yet to be conditionally certified. Third Circuit case law treats conditional certification—the first step of the two-step collective action certification—as the metaphorical gate through which the case must pass before notices can be sent out and class discovery can be taken. *See, e.g.*, *Symczyk*, 656 F.3d at 192. But Diabate's counsel began filing consent notices signed by opt-in plaintiffs as early as February 12, 2014, *see* Notice of Consent to Join Collective Action by Ronald E. Johnson, Jr., ECF No. 4; furthermore, as MV has stated in its brief, the parties have taken depositions of fourteen individuals and MV has produced 62,000 pages of documents and has made 17,000 additional documents available to Diabate. *See* Opp'n at 3.

Regardless of the fact that the parties have been more efficient in the conduct of the litigation than the first step of the conditional certification process anticipates, a defendant may not

bypass this first step and move immediately to the second—decertification—simply by engaging in a substantial amount of discovery prior to the date the plaintiff files a motion for conditional certification.  *See Mott*, 23 F. Supp. 2d at 490 ("[E]vidence offered by defendant purporting to show plaintiffs are not similarly situated to absent class members, while significant after discovery during the step-two analysis, does not compel denial of conditional certification." (citation and internal quotation marks omitted)).  Thus, as long as Diabate has made a "modest factual showing" of the existence of "a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees," *Symczyk*, 656 F.3d at 193, she is entitled to have this Court grant her motion for conditional certification.

Diabate argues that she has satisfied her "modest factual showing" burden because she has shown that the plaintiffs in the putative class "all worked for Defendant's Philadelphia operation as hourly, non-supervisory paratransit workers at some time between February 10, 2011, and the present, and they were and are subject to the common policies and practices that have resulted in Defendant's failure to pay for all hours worked and for overtime where appropriate." Mot. at 1-2.  The Court, for the most part, agrees.

As regards the *drivers*, Diabate has satisfied her burden to show that the potential class members' positions are similar to her own.  The proffered evidence details common job duties and responsibilities across Diabate and the proposed class, *Verma*, 2014 WL 2957453, at *11, and shows that the proposed class members were collectively "the victims of a single decision, policy, or plan," *Ruehl*, 500 F.3d at 388, in that they all were subject to MV's policies governing paratransit drivers.

The same cannot be said, though, of the drivers' *aides*, who Diabate seeks to include in the collective action.  Aides do not drive vehicles, but rather are assigned to ride along with drivers on certain tours.  Aides are also not subject to any pre- and post-tour policies that apply

to drivers: they do not pick up manifests or Tour Cover Sheets before their shift, they do not conduct a pre-tour vehicle inspection, they do not conduct a post-tour vehicle inspection, and they are not required to attend Drive Cam sessions. *See, e.g.*, Boykin-Barnes Dep. at 36:2-22; Duffy Dep. at 38:21-40:4. Given the evident distinctions between the duties of the drivers and those of the aides, Diabate has not made the requisite modest factual showing that the aides are similarly situated to the drivers. *See Goldstein v. Children's Hosp. of Phila.*, No. 10-1190, 2013 WL 664174, at *6 (E.D. Pa. Feb. 25, 2013) (finding that the plaintiff was not similarly situated to individuals subject to different policies than she).

Accordingly, the Court shall grant Diabate's motion in part and conditionally certify a collective action defined as comprising *all current and former hourly driver employees of Defendant MV Transportation, Inc. at MV Transportation, Inc.'s Philadelphia, Pennsylvania, facility who worked at any time during the period of February 10, 2011, through the entry of Judgment*.

## III.    CLASS ACTION PURSUANT TO FED. R. CIV. P. 23

"A party seeking class certification must affirmatively demonstrate his compliance with" Federal Rule of Civil Procedure 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S. Ct. 2541, 2551 (2011). Rule 23 "does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, *etc.*" *Id.* at 2550. "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982); *see also id.* at 160

("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable."). When there is an "overlap between a class certification requirement and the merits of a claim," the court should not hesitate to resolve factual disputes relevant to determining whether a class certification requirement is met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 316 (3d Cir. 2008).

"In order to be certified a class must satisfy the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation."  *Krell v. Prudential Ins. Co.* (*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*), 148 F.3d 283, 308 (3d Cir. 1998).  The Court, "in deciding whether to certify a class will resolve factual disputes by a preponderance of the evidence and make findings that each Rule 23 requirement is met or is not met, having considered all relevant evidence and arguments presented by the parties." *Hydrogen Peroxide*, 552 F.3d at 320.  A plaintiff is not required to prove her case during the class certification stage, but only prove that she has met the requirements of Rule 23.  *Id.* at 317. If the plaintiff satisfies the Rule 23(a) criteria, the Court must also determine whether the proposed class fits within one of the three categories of class actions defined in Rule 23(b). *Prudential*, 148 F.3d at 308.  "Failure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification." *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).

### A.    *Pre-Shift, Meal Break, and Post-Shift Claims*

Class certification for the state law claims based on pre-shift, meal break, and post-shift work will be denied because Diabate has not satisfied the commonality and predominance requirements of Rule 23.

### 1.    Standards of Analysis

### i.    Commonality

For the purposes of determining commonality under Rule 23(a)(2), "even a single common question will do." *Dukes*, 131 S. Ct. at 2556 (citation and internal quotation marks and

alterations omitted).  The requirement "does not require identical claims or facts among class

members," *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 597 (3d Cir. 2012) (citation and internal

quotation marks omitted), but instead is satisfied "if the named plaintiffs share at least one question

of fact or law with the *grievances* of the prospective class," *Rodriguez v. Nat'l City Bank*, 726

F.3d 372, 381 n.8 (3d Cir. 2013) (emphasis added) (citation and internal quotation marks

omitted).  The Third Circuit has set a low threshold for satisfying the commonality requirement.

*See Sch. Dist. v. Lake Asbestos of Que., Ltd.* (*In re Sch. Asbestos Litig.*), 789 F.2d 996, 1010 (3d

Cir. 1986).  That said, the language of the Rule is "easy to misread, since [a]ny competently

crafted class complaint literally raises common 'questions.'"  *Dukes*, 131 S. Ct. at 2551 (citation

and internal quotation marks omitted).  "Commonality requires the plaintiff" not to just recite

these questions, but "to demonstrate that the class members 'have suffered the same injury.'"  *Id.*

(quoting *Falcon*, 457 U.S. at 157).  The class's claims "must depend upon a common

contention," which "must be of such a nature that it is capable of classwide resolution."  *Id.*  As

stated in *Dukes*:

> What matters to class certification . . . is not the raising of common "questions"—
> even in droves—but, rather the capacity of a classwide proceeding to ***generate
> common answers apt to drive the resolution of the litigation***.  Dissimilarities
> within the proposed class are what have the potential to impede the generation of
> common answers.

*Id.* (emphasis added) (citation and internal quotation marks omitted).

### ii.    Predominance

To succeed on her class certification motion, Diabate must not only meet the commonality

requirement of Rule 23(a), but also, *inter alia*, the predominance requirement set forth in Rule

23(b).  A class will not be certified unless "common questions of law or fact predominate."

*Prudential*, 148 F.3d at 309.  "Predominance requires 'that questions of law or fact common to

the members of the class predominate over any questions affecting only individual members,'"

*Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185 (3d Cir. 2001) (quoting Fed. R. Civ. P. 23(b)(3)), a requirement more rigorous than Rule 23(a)'s commonality requirement. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011) (en banc). Because analysis in this case of the predominance requirement necessarily involves an evaluation of the commonality requirement, the Court will "analyze the two factors together, with particular focus on the predominance requirement." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 266 (3d Cir. 2009) (citation and internal quotation marks omitted).

### 2.   Analysis

Diabate argues that there exist common questions of law and fact that predominate over individual questions. Mot. at 23. She advances the following as common questions:

(1)   whether MV's policy of only paying from the scheduled start time, regardless of the fact that drivers and aides received their manifests and worked prior to their scheduled start time, violates the MWA;

(2)   whether MV's policy (until August 21, 2014) of paying drivers until their clock-out time, which was recorded as five minutes past the return yard time, regardless of the fact that drivers and aides were required to perform work after clock-out time because they were required to perform all of their assigned tasks before leaving for the day, violates the MWA;

(3)   whether MV's policy of deducting thirty minutes for a lunch break, even if the driver has written on the tour sheet that he did not get a break for lunch, because the billing clerk determined, based on the rides shown in the manifest, that there was time for a break, violates the MWA and the WPCL; and

(4)   whether MV's policy of not automatically ensuring that each class member entitled to the forty-hour guarantee does in fact receive forty hours of pay for weeks in which they are scheduled for less than forty hours violates the MWA and the WPCL.

*See id.* at 23-25. MV contends that Diabate's "questions," as framed, are too individualized to satisfy either the commonality or the predominance requirement and, thus, the answers to those questions are not "apt to drive the resolution of the litigation." *See* Opp'n at 6-21.

###### i.      Pre-Shift Periods

In arguing against a finding of commonality and predominance on Diabate's pre-shift off-the-clock claim, MV relies on *Babineau v. Federal Express Corp.*, 576 F.3d 1183 (11th Cir. 2009), a case factually similar to this one.  There, the plaintiffs were Federal Express employees who sought to certify a class on a variety of wage claims, including those arising from pre-shift unpaid work time.  They alleged that FedEx structured its employees' workloads such that it was usually impossible for its hourly employees to perform all necessary preliminary tasks during their scheduled shift and argued that FedEx thus *required* its employees to perform certain work activities during these pre-shift "gap" periods.  *See id.* at 1187-88.  The district court had denied class certification after concluding that individualized proof would be required to determine whether employees were actually working during the pre-shift gap periods:

> With respect to gap period work, there are innumerable reasons why an employee may have arrived at the FedEx facility early on any given day.  While those reasons may in fact relate to completing work, they may also relate to a plethora of non-work activities such as socializing, checking e-mail, beating traffic, etc. . . . FedEx has offered statements and testimony of a number of employees who have provided such plausible explanations for what occurred during the gap periods.  The statistical evidence proffered by Plaintiffs does not account for time spent doing activities other than work and cannot alone establish that work was performed.  Permitting these claims to proceed as a class action would deprive FedEx of the ability to explore whether an individual employee was engaged in non-work activities during the gap period and would thus limit FedEx's ability to properly defend the claims.

*Id.* at 1191 (citations omitted).  The Eleventh Circuit affirmed the district court's denial, finding that it had "reasonably concluded that punch clock records do not provide common proof of any uncompensated work during gap periods—particularly in light of employee testimony regarding the various non–work-related activities that took place during the gap periods and the various personal reasons that employees listed for coming in early."  *Id.* at 1192.

Although this Court is not bound by *Babineau*, given the similarities between the putative class, the legal claims, and the facts at issue, the decision is quite persuasive.  Just as in *Babineau*, there can be no common proof of Diabate's pre-shift claims.  Considering the circumstances of MV's pre-shift process, as recited *supra*, there is simply no way to "determine, without resorting to individualized inquiry" whether a driver arrived early on any given day, her reasons for doing so, and whether she engaged in work without compensation during that time.  *Hernandez v. Ashley Furniture Indus., Inc.*, No. 10-5459, 2013 WL 2245894, at *8 (E.D. Pa. May 22, 2013); *see also Cornn v. United Parcel Serv., Inc.*, No. 03-2001, 2005 WL 2072091 (N.D. Cal. Aug. 26, 2005) (denying class certification on the basis that the court could not "determine whether a driver performed work during the interval in question without undertaking individualized inquiries that predominate over common questions," where the defendant had presented evidence that its hourly employees arrived at different times and often performed a variety of non–work-related activities during the gap time).

The facts here are distinct from those found in cases involving class wage claims where *all* employees in the putative class were subject to employer policies *requiring* them to work off-the-clock prior to and/or after their scheduled shifts.  *See, e.g.*, *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir. 2014) (unpaid donning and doffing of protective equipment), *cert. granted*, 135 S. Ct. ____, 2015 WL 1278593 (U.S. June 8, 2015); *Keller v. TD Bank, N.A.*, No. 12-5054, 2014 WL 5591033 (E.D. Pa. Nov. 4, 2014) (employer policy that all retail bank employees work off-the-clock to perform pre-shift or post-shift security procedures when they opened or closed a branch).  The only factual differences among the class members in those cases were the amounts of unpaid off-the-clock time spent undertaking the required tasks.  Here, by contrast, MV has no policy requiring drivers to perform any work at all prior to the start of their scheduled shift.

Regarding Diabate's testimony that pre-shift activities could take fifteen minutes to complete (rather than the allotted twelve), other opt-in plaintiffs testified that drivers could begin their pre-shift activities at the start of their scheduled shift, and, should those tasks take longer than twelve minutes to complete, they could leave the yard later than the preprinted time with no punishments or adverse consequences. *See* Duffy Dep. at 18:12-20:11.[5]  And regardless, proving that MV "had a policy of holding its employees to efficiency standards that were difficult to meet would not prove that [MV] required any class member to work without pay." *Babineau*, 576 F.3d at 1193-34.

Diabate responds that where, as here, an employer does not consistently keep records of hours worked, as is required by both the FLSA and the MWA, the employer should not benefit from this failure to comply at the expense of its employees. Mot. at 26.  She relies on *Williams v. Tri-Cnty. Growers, Inc.*, 747 F.2d 121 (3d Cir. 1984), *abrogated on other grounds by Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 n.11 (3d Cir. 1991)), which states that "[o]nce an employee establishes that the employer's records are inadequate, the employee need only introduce enough evidence to support a reasonable inference of hours worked." *Id.* at 128.  She argues that *Williams*, the U.S. Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), *superseded by statute on other grounds*, 29 U.S.C. § 251 *et seq.*, and their progeny should allow her to "use an average based on representative testimony as well as the records that the company did keep" to determine MV's liability.  *See* Arg. Tr. at 10.  In support, she points to MV's temporary practice, for approximately one month in September and October 2011, of stamping on the Tour Cover Sheet the time a driver picked up their documents,

---

[5]   Duffy went on to testify at his deposition that even if the start-of-shift activities take longer than fifteen minutes and they are even later leaving the yard—if, for example, a problem with the vehicle is discovered and the driver has to have someone at MV's shop take a look at it—the driver is still paid for that time. Duffy Dep. at 19:16-20:11.

and provides—in Exhibit 6 to her motion—a chart that summarizes the findings of her review of select drivers' sheets from this time period by displaying the differences between each driver's stamped time on those sheets (reflecting when the driver picked up the manifest) and the driver's scheduled Clock-In Time.  *See* Mot. Ex. 6.

Without delving too deep into a discussion of how Exhibit 6 reflects a broad, nearly inexplicable range of scenarios—showing that some drivers picked up their documents a few minutes late, some exactly on time, and some nearly three hours early—and assuming *arguendo* that *Mt. Clemens*—which concerned alleged violations of the FLSA—does apply to class actions alleging state wage law claims, the Court rejects Diabate's assertion that the *Mt. Clemens* approach can be used here to establish, "as a matter of just and reasonable inference," 328 U.S. at 687, based solely on one month of time-stamped Tour Cover Sheets and related "representative testimony" of individual plaintiffs, the average frequency and length of time that the class of drivers allegedly worked prior to their scheduled start times after picking up their manifest.[6]  *See Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 629 (S.D. Cal. 2014).  *Mt. Clemens* requires that an employee first "prove[] that he has in fact performed work for which he was improperly compensated," and *only then* may he show "**the amount and extent of that work** as a matter of just and reasonable inference" by producing sufficient evidence.  328 U.S. at 687 (emphasis added).  So although *Mt. Clemens* may offer a classwide basis for proving *damages*, proving liability in this case requires that Diabate show that those in the plaintiff class performed uncompensated "work."  *See Gomez v. Tyson Foods, Inc.*, 295 F.R.D. 397, 400 (D. Neb. 2013)

---

[6]   The Court does recognize Diabate's statement that she does not rely solely on these stamped Tour Cover Sheets, but plans to offer representative testimony, as well.  But her "'representative' testimony in this case would not, in fact, be representative of the class as a whole because of the myriad of factual differences surrounding whether, when, and under what circumstances" the class plaintiffs performed compensable, pre-shift work.  Furthermore, such a practice may run the risk of violating the Supreme Court's repudiation in *Dukes* of a "trial by formula" approach to class certification, with MV's liability potentially being determined by reference to the individual claims of a sample set of class members.  *See* 131 S. Ct. at 2561.

("The relaxed burden [described in *Mt. Clemens*] applies only to damages, not liability—it does not help plaintiffs show that there was a violation . . . ; it only allows them to prove damages by way of estimate, if they had already established liability.").

Diabate has not shown how she would be able to prove liability, and the Court concludes, based on the record before it, that she has not affirmatively demonstrated "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (citation and internal quotation marks omitted).  As was the case in *Babineau*, permitting Diabate's claims to proceed as a class action "would deprive [MV] of the ability to explore whether an individual employee was engaged in non-work activities during the gap period and would thus limit [MV]'s ability to properly defend the claims."  576 F.3d at 1191 (citation and internal quotation marks omitted).[7]  The evidence presented demonstrates that the Court, in order to resolve the class members' claims, would have to undertake individualized factual inquiries regarding whether a particular MV driver actually performed unpaid work

---

[7]   The Eastern District of Louisiana, in *Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002), in finding that a putative plaintiff class' claims did not predominate over individual claims, reiterated a list of defenses that the defendant employer would be deprived of asserting as to each plaintiff's claim that he or she was required to work off-the-clock to the jury:

[A]s to any of the class members it may argue that: (1) the particular class member did not in fact work off-the-clock, (2) any instructions received to work off-the-clock without compensation were outside the scope of authority and directly contrary to well established policy and practice, (3) even if a particular class member did work off-the-clock, that employee unreasonably failed to avail themselves of curative steps provided by defendant to be compensated for that work, (4) if a class member received instructions from a fellow class member such as a personnel manager or hourly supervisor to work off-the-clock and/or not to request a time adjustment, then the class member unreasonably relied on instructions directly contrary to [the employer]'s express policy, (5) a class member had an actual and/or constructive knowledge of [the employer]'s policies banning off the clock work and voluntarily chose to engage in such work in deviance [sic] of that policy for any one of a number of reasons, and (6) that a particular class member has a unique animus toward [the employer] or its employees that would cause that class member to fabricate or inflate his or her claims.

*Id.* at 603.  This recitation provides a clear picture of several of the defenses MV could be deprived of presenting to a jury should the Court ignore the dissimilarities in the proposed pre-shift claims of the putative class members. *See Dukes*, 131 S. Ct. at 2556 (stating that a court "consider[s] dissimilarities . . . in order to determine (as Rule 23(a)(2) requires) whether there *is* "[e]ven a single [common] question.").

during each pre-shift gap period[8] and, if such unpaid work was performed, *how much* work was

performed. *Masterson v. Fed. Express Corp.*, 269 F.R.D. 439, 444 (M.D. Pa. 2010).

Accordingly, the Court finds that individual issues of fact surrounding any plaintiff's work

performed off-the-clock prior to a scheduled shift and MV's potential defenses predominate over

any common issues in the class on Diabate's pre-shift theory.  As Diabate has failed to establish

predominance, class certification on this ground must therefore be denied.

### ii.     Meal Breaks

Diabate similarly fails to meet her burden to establish commonality and predominance on

her meal break theory.  She phrases her alleged common question on the meal break theory as

"Whether Defendant violated the Pennsylvania Minimum Wage Act by deducting breaks for

time periods when class members were in fact unable to take a break."  Mot. at 19.  But this

question is merely a hypothetical and would not generate an answer apt to drive the resolution of

the litigation.  If an employer deducts breaks for time periods when employees are unable to take

a break, such deductions would likely, given the facts presented, constitute a violation of the

MWA.  But the operative questions here are whether the drivers worked through their meal breaks

and whether they were ultimately paid for the meal breaks they worked through; these questions

are not answerable by common proof.  There are a vast number of reasons as to why a driver

may not have been able to take a lunch break on a particular day, including traffic, construction,

accidents, switching vehicles, vehicle malfunctions, etc. (even, in one instance cited by MV,

needing to have the van cleaned).  *See, e.g.*, Opp'n Ex. O.  "These differences illustrate that

whether and how often potential class members worked through meal breaks would be an

---

[8]   At least two of the opt-in plaintiffs are not claiming they were deprived of pay for any pre-shift gap period work.
*See* Duffy Dep. at 18:10-19:10 (testifying that he was not compensated for time worked during "'O' time,"
"inclement-weather time," and "cash-out time"); Youngston Dep. at 18:9-19:3 (testifying that he is seeking
"[r]eimbursement for O time that was taken that I felt was given to the company but not compensated by the
company" and agreeing that he is not "looking for anything else").

individualized inquiry, rather than a common one." *Jarosz v. St. Mary Med. Ctr.*, No. 10-3330, 2014 WL 4722614, at *11 (E.D. Pa. Sept. 22, 2014).

MV had several policies in place to ensure that drivers were paid for their time worked, should they ever work through a lunch break:  manual review of the manifests by a billing clerk before taking a meal break deduction, the meal break deduction cancellation policy, and the Payroll Discrepancy Form.  *See supra* subsection I.A.2.  Going back through these records to second guess (or, in some cases, third guess) MV's decision that each driver's meal break should have been deducted and then endeavoring to determine which meal breaks a driver worked through and, if they worked through a break, how much work they performed during those breaks would require individualized inquiries.  *See Jarosz*, 2014 WL 4722614, at *11 ("The differences among the potential class members show that 'proof of the essential elements of the cause of action require individual treatment,' and therefore that issues common to the putative class do not predominate over individual issues." (quoting *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir. 2002)).  Class certification on this ground shall be denied.

### iii.    Post-Shift Periods

The above analysis applies with equal force to Diabate's post-shift and Drive Cam theories. Her claims that drivers worked beyond their Clock-Out time, either performing check-out tasks or attending Drive Cam sessions, involve individual issues that predominate over any issues that could be common to the putative class.

Because the drivers are completely in control of their Return Yard time—and, so it follows, their Check-Out time (because the Check-Out time is entered by the desk clerk as five minutes after the Return Yard time)—proving the essential elements of the causes of action alleged on this ground would require individual treatment; treating them as class claims would deprive MV of the ability to assert defenses to each individual claim.  An individual analysis of

each claim would need to be undertaken to determine at what point each individual driver entered his Return Yard time on his Tour Cover Sheet on each day, and whether he completed the check-out process no more than five minutes later.  A class' common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  Even if it is determined, through testimony or otherwise, that on one particular day a particular driver completed the check-out process later than five minutes after his self-entered Return Yard time, this determination does not in any way affect the determination of whether he completed the check-out process late on any other day or a determination of whether any other driver ever completed check out late.

Again the Court looks to cases like *Bouaphakeo* and *Keller*, detailed above, where all class members were required to undertake certain tasks at the ends of their shifts for which they were provably not paid, and thus all that the class needed to establish was damages in the form of how long those tasks took to accomplish.  Here, there is far too much individual variance to allow the class claims to go forward where there is no way to prove through common evidence that any driver worked at all past their clock-out time and, if they did, how long they worked past their clock-out time.

The same goes for the Drive Cam theory.  MV policy is to treat Drive Cam sessions as compensable hours worked, and drivers are paid for attending Drive Cam sessions.  If a Drive Cam session is erroneously not compensated, MV has a procedure in place through which an aggrieved driver can submit a Payroll Discrepancy Form to correct the error.  Opt-in plaintiff Boykin-Barnes testified that when he had a Drive Cam session, he would not enter his Return Yard time until after his Drive Cam session was completed, ensuring that he would be paid for the Drive Cam

24

session plus an additional five minutes.  Boykin-Barnes Dep. at 131:9-133:13; Opp'n Ex. HH.

MV should be entitled to assert the defense that other individual class members did the same—*i.e.*, were in fact paid for their Drive Cam sessions—or that individual class members failed to avail themselves of MV's curative process (the Payroll Discrepancy Form) through which they could correct any payroll errors.  Certifying the class would deprive them of this opportunity.

As with the pre-shift claims, the Court finds that individual issues of fact surrounding any work performed off-the-clock after the end of a driver's shift and MV's potential defenses predominate over any common issues in the class on Diabate's post-shift theory.  As Diabate has failed to establish predominance, class certification on this ground must therefore be denied.

### B.   *Forty-Hour Pay Claim*

Diabate's final contention is that a class should be certified on the ground that MV violated the WPCL by not paying class members who were guaranteed forty hours of pay for all forty hours during a week, pursuant to the Collective Bargaining Agreement.  *See* Mot. at 19. MV advances several arguments in response, including, by implication, that this claim fails the adequacy of representation requirement of Rule 23(a)(4), because Diabate—the only named plaintiff, who was never herself entitled to the forty-hour guarantee, as she worked for MV for less than two years—is not an adequate representative of the class.  *See* Mot. at 28.

 The adequate-representation element requires a determination of: (1) the qualifications, experience, and general abilities of the plaintiff's lawyers to conduct the litigation; and (2) whether the interests of the named plaintiffs are sufficiently aligned with the interests of the absentees.  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 532 (3d Cir. 2004).  Diabate has not established that her interest sufficiently aligns with the interests of the absentees because she admitted that she has no claim to the forty-hour-pay guarantee.  *See* Reply at 9.  Diabate, who has no class state law wage claim remaining in the litigation, would not be an adequate representative of a

class that would necessarily need to be redefined to encompass a group of people to which she does not belong—those employees of MV who met the requirements to be entitled to a forty-hour guarantee.

Accordingly, the motion for certification on this ground shall be denied, though the Court shall grant Diabate's request, as advanced in her Reply, to amend her complaint to add a lead plaintiff who was entitled to this guarantee to represent those putative class members. Should MV need to depose this new lead plaintiff, the Court will provide a brief period of discovery to facilitate this before Plaintiffs' counsel files a renewed motion for class certification, at which point the Court will rule on the substance of this claim.

## IV.      CONCLUSION

Based on the foregoing, the motion for conditional certification of the FLSA collective action is granted in part. The motion for class certification of the MWA and WPCL claims is denied. The Plaintiff is granted leave to amend her complaint to identify a lead plaintiff to represent the class of employees entitled to the forty-hour-pay guarantee.

An appropriate Order follows.


Dated: **July 20, 2015**


                                        **BY THE COURT:**

                                        **/S/ WENDY BEETLESTONE, J.**

                                        _____
                                        **WENDY BEETLESTONE, J.**

26